The morning docket, it's Albert L. Smith versus the City of Benton, 08-0451. Mr. Ford and Mr. McEvitt, McEvitt. Mr. McEvitt. Council. May it please the sign of the court, council. This is an action involving the formation of a contract. Before this court on appeal, a final order entered in favor of the defendant, Peveley, of Circuit Court of Franklin County. Honorable David Franklin presiding. The order was entered in July of 08 on an evidentiary hearing on June 4, 2008. The court ruled that the City of Benton and the plaintiff had made an agreement by which the plaintiff could retire from the city fire department. The issue presented by this appeal is essentially, was it against the manifest weight of the evidence for the trial court to find that a meeting took place between the city attorney and the plaintiff, Albert Smith, where Albert Smith agreed to accept the City of Benton's counteroffer not to pay his tax liability for the lump sum settlement he received when he retired. There is no question that Albert Smith wrote a letter prior to any meeting setting out the terms of his offer to retire. One of the terms was that he asked the city to pay any tax liability he would have for the receipt of the lump sum settlement that he was going to receive by virtue of his retirement. So he wanted to clear $36,000. Yes. Is that the bottom line? I think that's what that letter states, and I think it's clear that that was what his intention was. There's no question. So we're talking about how much money totaled in? $4,000 or $5,000 maybe? It was $9,000. Pardon me. It was a total of $9,000. In taxes and whatever he had? That he had an account to pay his taxes, and he wrote a letter and submitted evidence that the amount was $9,000. The city had a meeting on April 12th following the writing of this letter, and they, in an open meeting, agreed to accept the offer of Albert Smith, the city attorney who presented that offer, to the city council. However, under the minutes of that meeting, there was no discussion as to the tax liability, as to the payment or nonpayment of the tax liability. It said it had words to the effect that the amount that would be paid would be put on a 1099, which didn't address the issue of whether or not there was a tax liability or that it would be paid or not paid. Can I ask you this? At any time prior to the trial, did they know there was an additional $9,000 due? Are you contending at the time that the council discussed this I wrote a letter to Commissioner Moore. Is this in evidence? It is in evidence, yes. I wrote a letter and demanded the money. Did you, I mean, when they negotiated it, did they know they were going to have to pay $9,000 in addition to the $36,000? No, not at that time. Nobody knew the number. You're saying they agreed to it without knowing what the number was? That's correct. Okay. Well, I'm not saying they agreed to it. You're not saying they agreed to it. I'm not saying the city ever agreed to it because the initial letter was written to the police commissioner, John R. Moore, who testified, and when it was presented to the city council in full, that was not mentioned one way or the other. So our position is that the city council didn't agree to the terms that's stated in the letter, but they didn't, but my client didn't accept when they passed that meeting. Wait a minute. Let me back up here. He wrote a letter, or he wrote a statement in which he offered to retire if he had no tax liability. That's correct. That was not signed by the city? No. Then the city responded and said they would hold him harmless with respect to any tax for which the city would be liable. That was after the meeting. And then he signed it. No, he didn't sign it. He didn't sign that? No. Nobody signed it? No. Okay. They're saying it was an oral agreement that occurred at this so-called meeting that occurred in the early part of April prior to the city council meeting. So we have competing letters saying two different things. Yes. Neither of which are signed by both parties. That's correct. Is it in evidence that he got the letter from the city that said it would be a 1099? Yes, there's no dispute that he got the letter. And then after that he retired? Yes. What was your opinion? But the letter didn't say he was going to be. The letter is a little confusing by the language that was used. I was going to ask you, what was your opinion, or what is your opinion? It's the same now as it was back then. When you read that, I don't have it right in front of me, read that portion of it that said he's not liable for anything that the city may be liable for or something there. I mean, what does that mean? It says that the language is that the city wouldn't pay, it didn't say that the city wouldn't pay his tax liability. It said that the city would hold him harmless with respect to the portion of any tax for which the city would be liable to pay. Now, what do you take that to mean? And what did you take that to mean? I haven't ever had anybody explain to me what they mean by that. Did you and your client talk about that as soon as you got it? We've talked about that for hours. But he still went ahead and, knowing that was there, went ahead and retired and collected it. He took it to mean that the city was paying his taxes, and there's testimony to that effect in the record. And you read it that that means the city is going to pay his taxes? Well, he read it that way. That's the way my client read it. He's not an attorney. I understand that. How did you read it? I was involved in the case at that point. Okay. I got involved in the case after all that had already occurred way down the line. Okay. Do you read it now that that means the city is going to be responsible for your client's taxes? I think that my client would take it that way. No, how do you read it? I don't think there was an agreement. I understand that. If there wasn't an agreement, then we may be back to square one. I don't believe that it says that the city is not going to pay his taxes. It says the city is going to do something. What is it that the city promised to do with that statement? The city promised to hold him harmless for some liability that the city was going to have? What kind of a promise is that? Well, I'm saying is that what it says? That's what it says. It says the city is going to hold him harmless for some liability that the city would have. So that's what it says. That's what it says. It doesn't say the city is going to pay his taxes, though, does it? No, it doesn't. Okay. But that's the way he read it, and I think all his actions after that are consistent with that. Well, would we look at that with his subjective determination or objectively what a reasonable person the court would determine? Well, I think a reasonable person would think that the city was making some kind of a promise to do something. Well, the fact they used a 1099, though. It didn't say how much was going to be on the 1099. That's the other thing. The other thing is that the court Pardon me. I thought that letter, again, I'm trying to do it from memory, said the lump sum and then a 1099 for the lump sum. Is that what it says? I don't have the letter here in front of me, exactly. I have a language here that is what it says having to do with the tax liability. Okay. Which I think is the issue. I mean, but most people, when they get a 1099, know this being reported to the IRS, they're going to have some tax liability along with that, right? I mean, that's the only reason why he gave a 1099. Well, yes, but then it doesn't mean that the city is not going to give him the money to pay the tax. Just because he got a 1099. He's going to get a 1099. There's no obligation for any person giving another person a 1099 to pay the tax. They could give him a 1099 and include the tax money on the 1099. There's no obligation for the city or for any other person that has services performed that gives out a 1099 to pay the tax that goes along with that 1099. I don't know that my client is sufficiently schooled to know the difference in that argument, Your Honor. That may be a legal argument, but he's a common layperson. And he thought he was going to get the money because he thought they agreed to it. That was how he thought. I mean, everybody that gets a 1099, unless there's some additional agreement, knows that they are responsible to the IRS for payment of whatever taxes incurred based upon the 1099. Doesn't it make sense, though, that he'd get the 1099 first for the initial amount, and then when he found out what his tax liability was, then he would ask the city for that money? He'd get another 1099 maybe in the next year for the additional money that they had to pay? That who had to pay? That the city would pay and he paid for the tax. But they wouldn't necessarily include it in the initial amount because they wouldn't know how much his taxes were going to be. How much the tax was going to be was based on increment. What was the 1099? Was it $36,000? $36,000, yes. And it does say the city will agree to pay the lump sum of $36,000 that you have requested pursuant to a 1099. So it does look like it was going to be $36,000, but your argument is there could be a second. Yeah, there could be a second payment. I mean, it didn't say there wasn't going to be a second payment. And none of the correspondence after this, even after the fact, even after he retired, he wrote a letter to the city and said, how come I didn't, you know, I've got to get this money, and they wrote right back and say, no, you're not. We're not going to pay you. He offers to come back to work at that point. There's no mention in any of the correspondence between him and the commissioners or between me and the lawyer for the city at the time, Rebecca Whittington, that there had been this meeting where this oral agreement had been made between my client and the city. The only letter that confirms this is the letter that was written by Commissioner Moore about two weeks after the city council meeting, which, yes, states those things, but I think that that letter is inartfully drawn. And the thing that just blows me away is the fact that Commissioner Moore says to the court that this letter is written with the supervision of the city attorney, and he just read it and signed it. That's not, to me, credible at all, because if you look at the letter, the letter is not a letter written by an experienced attorney like Attorney Whittington is. There's no mention of the fact that there's no specific mention that the taxes are not going to be paid. There's this inartful clause in the letter that says whatever. I mean, I have had as much trouble with that as the court's had with it over the last few years. I mean, basically, this was a – and there's one other thing. There's no other evidence that the city brought forward to say that this – how this meeting occurred. My client writes a letter to the commissioner. They have an executive board meeting, which is in the record. It doesn't mention that they're going to direct this matter to the city attorney and that she's going to negotiate with him about any of the terms. Miraculously, they just appear at a fire station, supposedly, by the witness. And there's only one witness that said this meeting took place other than my client, who said it didn't. That was the fire chief. Commissioner Moore wasn't there. He said he was invited to the meeting. Your client was there. My client says it didn't happen. He said he didn't meet me. He said the only time he met was the day he retired. There's no letter inviting him to the meeting. There's no testimony made to phone call. The city attorney – the ex-city attorney doesn't testify about coming and having the meeting. It's the fire chief who testifies that he witnesses. And at the end of his testimony, he says, in response to a question by counsel, I can't honestly say that Mr. Smith was in agreement with it, but his wife, you know, directed him to be quiet. And that's how he concluded that he had agreed to this supposed counteroffer. Well, that's not an agreement in my estimation that he – the conclusory that he was in agreement with this counteroffer. Of course, we say the meeting didn't take place at that time. I mean, the meeting had to take place in between the letter that my client wrote initially and the city council meeting that accepted, supposedly, this agreement. If the meeting took place at any other time, it's irrelevant. The fire chief, initially in his testimony, wasn't even sure when it took place. He stated that the initial discussions of this took place in late May or April. He wasn't sure. Did your client's wife testify that she didn't go to any meeting? No, Your Honor. The reason for that was that they had never raised the fact that there had been a meeting to me in any correspondence, in any letter. I'm in court trying to prove I'm not pregnant, basically. Okay? That a meeting that they say happened didn't happen, that they've never raised as an issue in any correspondence or in any plea. No, I didn't have her there. I didn't think she was needed. Because I didn't know that that was the main issue in this case until we got to the trial. Was the city attorney called as a witness to confirm that the meeting was held? No. No, she was not called. The last thing is that the court, in its ruling, indicated that Mr. Moore went to the fire station to attend a meeting. But that's not in the evidence. There's no... Not in the evidence, I'm sorry.  That he didn't go because he got a phone call saying that the meeting was over. Well, I objected to that, and the court let it in because at that point he was talking about why he wrote the letter two weeks later, and the court let it in only to show his state of mind as to why he wrote the letter and not for the truth of what had happened. But then the court, when it wrote its decision, stated that that was the reason why they believed that the meeting took place, was because he went to the fire station. Well, I think the court erred in listening to the evidence and erred in taking that evidence and using it for that purpose because it wasn't admitted for that. So, for all the reasons that are stated, we don't believe that the city proved that there was a meeting, that there was a counteroffer accepted by my client, and that there was no agreement for him to retire and that he retired mistakenly and he's entitled to be reinstated to his previous position. He wants to pay back $36,000 and whatever interest is on there and go back to square one? Yes. We offer to do that. Thank you, counsel. Thank you. Counsel. Please support. Counsel. Tom Alford. I represent the affiliate of the city of Benton, for this matter. As you heard in the argument presented by counsel, the issue here was the ruling of Judge Franklin, Franklin County Circuit Court, against the manifesto of the evidence. The underlying issue was, simply, was there a contract that existed? And after the evidence was presented, Judge Franklin obviously indicated, yes, there was, and he made his ruling. This started off as a two-count complaint. His first count, it was actually a one-count complaint, saying that there was a contract and that they should pay him his income tax consequences on that complaint. Subsequently, it was amended and filed a second count that says, no, there's no contract and put me back in my job and let's just go down the road like nothing happened. So at the close of evidence, there was a direct authority on count one saying that there was, in fact, his argument was that there was no contract. So we go from there. The underlying issue here, there really was no contract signed by both parties. There's not a signature? There's a letter from Mr. Smith saying, I want no tax liability. There's a letter from the city saying you're absolved from liability that the city would have to pay. But there's no written agreement? There's not a signed written agreement. What there is, and I think that to elaborate on that for a minute, that there are initial oral confrontations between Larry Keith and Mr. Smith, saying, hey, I'm interested in early retirement. Mr. Smith says, what I'll do is I'll retire and I'll help the city. I'll be a nice guy. I'll help the city. And you later find out that if he would have voluntarily retired, he would have got $5,000. But instead, to help the city, he wanted $36,000. He wanted all of his sick days paid. He wanted all of his vacation days paid. He wanted his pension paid. And he wanted to know the date that he could expect his first pension check. So on that letter that he sends, it doesn't just say $36,000. What happens is he says, here's what I want with a bullet point, a list of these different items. And to establish the idea that credibility is so important here, and unfortunately this court doesn't get to observe how the witnesses testify, but it's at hand from the first, from the beginning, from Jump Street at the circuit court. He says, the plaintiff, Mr. Smith, testifies that he gives this list of demands, his offer to retire early to the fire chief. He says the fire chief takes it to one commissioner, and at 15 minutes he returns and says, it's a done deal. It's accepted. All your terms are met. Does that commissioner have the authority to do that? That commissioner does not have that authority, nor does any other commissioner have that legal authority to act unilaterally. Mr. Smith has ran for city council. He testifies that he's ran for city council. He's asked questions by me. Do you think you could act unilaterally? Do you think that if the shoe was on the other foot and someone came to you and said, here's what we want, could you allocate that in 15 minutes? He says, no, I couldn't have acted unilaterally. So that's the first issue of credibility. And then they continue. He goes on to say that he – Well, when was there a meeting of the minds? I mean, obviously, you're fine. The city thinks that there was a valid contract. Correct. What we have, Your Honor, is we have a situation where you have a written offer, you have a meeting where folks attend. That includes the plaintiff, Mr. Smith, his wife, the then city attorney, Rebecca Whittington, the fire chief, Mickey Marshall, and this commissioner, John Moore, is also invited, but he's at grand jury proceedings because of his other job, and he's unable to get there in time before the meeting ends. Now, at that meeting is where, although reluctantly, he's frustrated, his wife basically says, hey, okay, these two agree to this. Mickey Marshall testifies that they agree. He testifies that, you know, he's obviously upset because he wanted them to pay him. And Judge Franklin goes on to say that his offer is accepted with the special mention that the $36,000 lump sum payment will be paid on a 1099, will be reported on a 1099. Now, Mr. Ford gets up here and says, well, my guy, you know, he's not the average guy. He doesn't understand that. But what he doesn't tell you is that his wife works at a bank, and that came out in testimony. What he doesn't tell you is that he's an independent contractor payment that gets 1099. He doesn't tell you that, and that all came out in testimony. So you're saying that the contract was binding at this meeting, or did it steal it? The contract was that there was the offer, there was the commerce, there was the meeting. There was a meeting of the minds. There was a confirming letter to that bank. And then Mr. Smith, again, he takes his lump sum payment. They have a retirement party for him. He takes his $36,000. Well, wait a minute. Let me back up a minute. After the meeting where the details were worked out, Mr. Smith sends a letter saying, here's what I'd like to have. Then there's a meeting, and presumably there's some harsh trading or what have you there. And they come up to a tentative agreement. And then the city council then votes on this at a subsequent meeting and then sends this letter to him. So once the city then voted on it, you think that's when the contract was completed? What I think, Judge, is this. There was a meeting of the minds between the parties at that meeting at the fire station. And then on April 12th, a few days later, the council, because they couldn't act unilaterally, Mr. Moore couldn't act unilaterally, it was presented and then it was unanimously approved by the council members. So this letter, and I have a date. It's in your brief here. The city will agree to pay so-and-so and so-and-so. In your opinion, that just confirmed the contract that the parties had entered into? That was a confirmation. The key is this meeting. We had two witnesses that could have confirmed or denied it, Wayne Tinn and Mrs. Smith, neither of which were called by anybody. And Judge, in this case, Mr. Smith has the verbal proof. Mrs. Smith could have called his wife. She works across the square at the bank. I mean, she could have been Mr. Ford and said, well, I didn't know. And I don't have it in front of me. I don't think I may have even disclosed her as a witness. So for him to say, well, I didn't know until that day, I mean, she may have been on my school. So obviously, but the point is, he says, well, why wasn't the city attorney called? He has the verb, not us. And the judge, again, which I think is so important here, is the issue of credibility to make this determination, how the evidence was presented, to observe their testimony. And obviously, Judge Franklin found the testimony of Commissioner Moore. Could you answer this question that the opposing counsel in the court has trouble trying to figure out what it means? Hold you harmless with respect to the portion of any tax for which the city would be liable to pay, with respect to said lump sum payment. Explain to me what that means. What was the city trying to say? I asked. Again, I didn't write that letter. That was before I was the city attorney or not. But I asked Mr. Moore and Mr. Ford have asked him also. And my recollection in the record is that it referred to the city would have obligations for unemployment taxes, for payroll taxes, and they simply wanted him to understand that because this was such a sticking point. It was a take-it-or-leave-it situation. That was the only thing that he wasn't getting out of all of his demands was they were not going to pay his taxes, his personal income taxes on that $36,000. So, again, I didn't write the letter, but one can assume for them to make the comment, and Judge Franklin, I believe, made that assumption, special mention of the 1099, and that they would hold him harmless from any income, any taxes that they would be responsible for. What's the purpose of that? Why would you ever be responsible for taxes that somebody else is liable for? That's nonsensical. Judge, I didn't write the letter. The only comment I can make is when it was asked what taxes would they be in it, that's what came out, unemployment taxes, payroll taxes. So, again, I didn't write the letter, so why it says that I can only make the assumption based upon that. But, again, I think that when you go back to this credibility issue, what happens is this. He says initially, well, there's a meeting of the minds. We've got this. They're going to pay my taxes in March and April of 2004. But then further testimony of the plaintiff, the appellant, Mr. Smith, says, hey, I contacted a certified accountant in November of 2004, and I asked him, well, why did you contact him? If you thought that there was a meeting, that there was a meeting of the minds, you had this contractor, the city was going to pay your income taxes in March and April. He says, well, it was some letter that I got. He thought the city would fight him. I was informed that the city would fight him on the taxes. So he says, well, they sent me a letter. So I say, well, can you show me the letter from the time of your retirement until you went to this account? Well, there was no letter ever produced. So there's not been a letter. So obviously what happens here is you've got the gentleman who the testimony showed was having financial difficulties. He had credit cards that were outstanding. They were calling his employer. He testifies that he had to pass through debt on those credit cards. You have a guy who testifies, I want to help the city, but in reality he takes $31,000 from him, and his big concern is, hey, give me my vacation and sick days, and by the way, it went to my pension and stuff. And I think what happens is this. Reluctantly he agrees to this, and then all of a sudden eight months down the road he's like, maybe the money's spent. Who knows what happens, but he wants a better view. So he comes to court saying, hey, let's rewrite this. Let's say they ought to pay my taxes. Let's even do one better. Let's just give him my job back and say that nothing happened. Well, Judge Franklin, he saw through that, like I said, on this issue of credibility when you go through those courts. And I think the fact that it's so important this meeting occurred is just added to that he says that one commissioner unilaterally asked in 15 minutes to meet all these points, that I'm helping the city by taking more money, and that I called an accountant, but I don't have a letter, but I thought there was a meeting of the minds eight months earlier. So clearly this just falls in line, the fact that he says, hey, there's never been a meeting. There was no meeting. You know what? If there was no meeting, then call your wife to testify that there was no meeting. He didn't do that. So when you weigh the evidence, as Judge Franklin did, when you observe the credibility of the witnesses, as Judge Franklin did, it's clear, in his opinion, that there was mention of the special exception as to it being placed, the lump sum being placed on the 1099. And as the law is clear for you gentlemen, that you have to get great deference to the trial fact on these issues. And based upon that, I would ask that this court confirm Judge Franklin's award in ruling in this matter to the trial court. Thank you, counsel.  Yes. Court? Counsel's statement that Mr. Moore testified about employment tax and all that is incorrect, because in the record at page 225 through 226, Mr. Moore testified that he did not know of any tax liability that the city had to pay as a result of Albert Smith's retirement. Specifically in answer to a question that I asked. This story about the credibility and all, the court, I don't think is here to weigh the credibility. The credibility was there for the court to determine. The question is, was there other evidence, you know, all this documentary evidence that never refers to any kind of meeting. The court ignored all that. There's no, I mean, he says, well, the wife didn't testify, well, that's, well, city attorney didn't testify. They didn't call her to say that she negotiated such a contract. So. What's your allegation that she negotiated a contract or a counteroffer being the nonpayment of his tax liability? Well, I'm sorry. The nonpayment of his tax liability. She's saying they. She's saying they negotiated the nonpayment of his tax liability. Well, she's never said it. She didn't testify. She was never a witness. The only thing we have is this confirmation letter, which is unclear, which contains a clause that doesn't make any sense. I mean, do not all terms of the contract supposedly make, supposed to make some kind of sense somewhere? Is it more, does it make more sense that my client believed that to be an agreement that they were going to pay his tax liability? I mean, just because she negotiated it in the meeting doesn't mean that when it was presented to the city council that they accepted it. They accepted whatever's on the record in that city council meeting. And there's no mention of it one way or the other. Now, my client didn't know that. He got a confirmation letter that he believed said, yeah, they're going to pay my taxes. So he, that's why he acted the way he did. He acted consistently. Now, the fact that he did go to an account. He went to an account. He got a letter. Oh, wait a minute. Back up. He got a letter from the city saying they were going to pay his taxes. He got a letter from J.R. Moore two weeks after the, that was that letter that has that clause in there that doesn't make any sense. That he took to mean that they were going to pay his taxes. Because it says, it has language in there that says to the effect that they're going to hold him harmless. Harmless from what? What else could there have been that they were going to hold him harmless from? It was from his tax liability. You're talking about your exhibit number two. Yes. It doesn't say that exactly, but that's the way he read it. He misread it. He misread a letter that they sent him that contained a clause that didn't make any sense. So, all this testimony about my client's money trouble, I found to be somewhat irreprehensible because of the fact that, I don't believe that testimony at all. Because if a creditor calls up to an employer and starts telling them about how my client owes them money, that goes beyond my experience. That doesn't happen in the state. They call up and they ask for him. They might ask if he's there. They might ask, but they don't start telling the fire chief that he owes money to them and how much it is and all that kind of thing. That testimony by Chief Marshall doesn't apply, in my opinion. So, that is not the experience of me handling dealing with creditors in this day and age. If you call them on the phone and try to get information out of them with confidentiality issues, they're not going to discuss the fact that my client owes them money. Let me get back full circle here. Are you aware of any situation where the person who prepares the 1099 and gives it to another person, or services or whatever, would be responsible for any taxes? It was a retirement. It was a 1099-R that came in. It's in the record. A person retires to get money under the 1099-R. You're going to get a 1099-R. There wasn't any agreement whether or not to get the 1099-R. It's coming. It was coming anyway. That's their responsibility to the IRS when they pay my client money. Well, my question is, absent some additional agreement, is there ever any responsibility on the person providing the 1099 to pay taxes? Is there any liability? Absent some additional agreement, there is none, right? Of course not. Okay. Thank you. Fellas, thank you very much for your...